UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR. NO. 04-10148-RCL |
| | ) | |
| v. | ) | |
| | ) | |
| SHAWN SANDLER | ) | |
| | ) | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

### Introduction and Summary

The United States of America, by and through its attorneys United States Attorney Michael J. Sullivan and Assistant United States Attorney Donald L. Cabell, hereby opposes the defendant's motion to suppress certain statements made to ATF agents prior to his initial appearance on the present charges. The defendant argues that the agents improperly elicited the statements through interrogation after the defendant had stated that he would not answer any questions without an attorney. This claim, however, is based on a version of events which is partially and materially incorrect. The defendant did indicate that he would not answer any case related questions without an attorney, but he agreed to answer routine booking questions, and he voluntarily made -- indeed, blurted out, the statements at issue during that process. Because the statements were not elicited in violation of the defendant's rights, the motion should be denied.

### Facts

The government expects that the following evidence would be

adduced at an evidentiary hearing.  On April 1, 2004, the defendant was transported from the Essex County House of Corrections in Middleton, MA to the federal Courthouse for his initial appearance in this case.  At about 9:15 a.m., ATF Special Agents Thomas Perret (SA Perret) and Mattheu Kelsch (SA Kelsch) went to the cellblock to conduct the defendant's post arrest processing.

The agents and the defendant were not actually in the same room.  The agents were in an interview room and the defendant was in a contiguous room.  The rooms shared a common wall and built into the wall was a screened partition that allowed the agents and the defendant to see and speak to one another.

When the defendant was brought into the room, he looked through the partition.  He recognized the agents from previous (non-interrogatory) meetings and he told them that he would not answer any questions without an attorney.  The agents explained that they did not plan to question the defendant about the case and intended only to ask him background biographical questions as part of the arrest.  The defendant agreed to answer the questions.

Contrary to the defendant's factual assertions, SA Perret did not then say, "You're going to take all the heat.  You know you can get 30 years.  Why don't you help us?"  Rather, and prior to asking him any questions, SA Perret further explained that,

once the defendant had been appointed an attorney, which was likely to happen that day, the agents desired to speak with the defendant and his attorney regarding the defendant's possible cooperation. The purpose of this was to ensure that the defendant conveyed the information to whomever was appointed to represent him. SA Perret also explained to the defendant what was likely to happen in court that day, i.e., the initial appearance before the magistrate, and apprised the defendant of the specific charges against him and the maximum penalties he faced.

SA Kelsch then began to ask the defendant biographical questions, and recorded the responses. In the midst of this process, the defendant said words to the effect, "I'll do my time, I know who you guys want." The agents told the defendant to stop, and reminded him that they would like to discuss the case when, but only when he had an attorney.

SA Kelsch resumed the questions. Once again, however, the defendant suddenly stated, "All I want is to see my son for a couple of days before I go away; you guys can put me on a bracelet." The defendant further stated words to the effect, "I'm no rat but he screwed me by not helping me, he's got it coming, that guy f**ked me, left me out there." The defendant also stated, "I was incarcerated during some of the fires. If I help (or talk) can you get me put in (OC?)? I don't want to go

back to Middleton."  The agents then completed the biographical questioning of the defendant and the Marshals returned him to his cell.

Following these events, the agents subsequently informed the undersigned AUSA of the defendant's statements.  SA Perret was asked to prepare a report summarizing the events, which he did on April 7, 2004.  The government sent the report to the defendant's counsel the same day.

### Argument

**THE DEFENDANT WAS NOT SUBJECTED TO CUSTODIAL INTERROGATION IN VIOLATION OF HIS MIRANDA RIGHTS.**

Legal Framework

In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court held that "certain warnings must be given before a suspect's statement made during custodial interrogation could be admitted in evidence." see also Dickerson v. United States, 530 U.S. 428 (2001).  As is common knowledge, the Miranda warnings include the right to remain silent and the right to an attorney.  Officers are required to respect a suspect's request for a lawyer and not initiate further interrogation. Oregon v. Bradshaw, 462 U.S. 1039, 1042-44 (1983).

However, before the Miranda rights attach, there must be custodial interrogation.  As a general rule, interrogation has been defined for this purpose as express questioning or its functional equivalent, which includes  "any words or actions on

the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Pennsylvania v. Muniz, 496 U.S. 582, 600-01 (1990) (quoting Rhode Island v. Innis, 446 U.S. 291 (1980)).

As this cited language suggests, there is a notable exception; Miranda does not apply to routine booking questions securing "biographical data necessary to complete booking or pretrial services," Muniz, 496 U.S. at 601, although this exception does not apply to questions that are designed to elicit incriminatory admissions. Id. at 602.

Analysis

The statements at issue were not elicited in violation of the defendant's rights.  First, the statements did not arise during custodial interrogation.  The defendant indicated that he did not wish to speak about the case without an attorney and the agents similarly stated that, while they wanted to discuss the possibility of the defendant's cooperation, they also did not want to talk about the case until he had obtained counsel who could be present for such a discussion.  Consistent with this position, and as the defendant implicitly concedes, the agents did not ask the defendant any questions regarding the charged offenses.  It is true that the agents asked the defendant some questions but these were routine booking questions that did not

constitute custodial interrogation.  <u>Muniz</u>, 496 U.S. at 601.

To be clear, even accepting that some routine questions may be asked in order to yield incriminating statements, that certainly is not the case here where not even the defendant disputes that the questions were entirely routine and not designed to elicit incriminating statements.  Indeed, not only is it clear that the defendant's sudden blurting of the statements at issue was unrelated to any of the routine questions the agents asked him, his spontaneous statements in fact ***interrupted*** the routine questioning, and the agents had to admonish the defendant to stop and remind him that, while they wished to discuss the case, they did not want to do so without his lawyer being present.

The defendant contends, though, that the agents' statements that they wished at some point to discuss his cooperation bring this case within the purview of <u>Edwards</u> and <u>Ortiz</u>, but he is wrong.  In those cases, the agents, after being informed by the defendant that he did not wish to speak to them without an attorney, initially complied, but then asked him if he wished to cooperate, ***and then proceeded to formally interrogate the defendant about the charged offenses***.  <u>Edwards</u>, 451 U.S. at 484; <u>Ortiz</u>, 177 F.3d at 109.  Put another way, the agents in those cases asked the defendant if he was interested in cooperating, and then used that overture, and the defendant's subsequent

6

reciprocal interest, as a springboard to initiate a formal interrogation. This case is inapposite. The agents <u>told</u> the defendant they were interested in discussing his cooperation but they did not <u>ask</u> him if he wanted to do so, or seek a response to their statement. Moreover, the agents certainly did not use the statement as a way to initiate an interrogation or statements by the defendant. On the contrary, the agents instructed the defendant not to discuss the case until his lawyer was present. The defendant made his statements notwithstanding this admonition.

### Conclusion

Because the defendant's statements were unsolicited and not the product of custodial interrogation, the agents did not violate his constitutional rights. The motion therefore should be denied.

Respectfully submitted,
MICHAEL J. SULLIVAN
United States Attorney

BY:   /s/Donald L. Cabell
      Donald L. Cabell
      Assistant U.S. Attorney
      One Courthouse Way, Suite 9200
      Boston, MA 02210
      (617) 748-3105